414

[Civ. No. 17153.   Second Dist., Div. Two.   Dec. 29, 1949.]

WENDELL W. WEESNER, Respondent, v. LEASED
TRANSPORTATION (a Partnership) et al., Appellants.

Adams, Duque & Hazeltine, A. Andrew Hauk and William Stinehart for Appellants.

John L. Huntzinger and Warner I. Praul for Respondent.

WILSON, J.—From a judgment in favor of plaintiff in an action for an accounting and to obtain commissions allegedly due under an oral brokerage contract, defendants appeal. They have also purportedly appealed from the interlocutory judgment and from the report of referee on accounting.

In January, 1941, plaintiff and defendant General Truck Rentals entered into an oral agreement whereby plaintiff was engaged as a full time broker, salesman and contact man; in this capacity his duties were to make contacts with and solicit business from prospective users of trucks and automotive equipment which was to be supplied by defendant; in consideration for plaintiff's services defendant agreed to pay a commission of 10 per cent of the gross amount of all rentals and receipts for the use of automotive equipment received by defendant from any and all users thereof contacted, solicited or procured by plaintiff. Some months later, when defendant Leased Transportation Service was formed and commenced business, it also entered into an oral agreement with plaintiff the terms of which were the same as the prior contract entered into with General Truck Rentals and embodied the same arrangement for the payment of commissions to plaintiff for services as a broker, salesman and contact man; in October, 1941, both contracts were modified to provide that the commissions thereunder would be divided equally between plaintiff and one Merrill P. Brooks, who was employed by defendants in the same capacity and compensated in the same manner and at the same rate as was plaintiff, so that each would receive a commission of 5 per cent of the gross rentals and receipts on all future business obtained by either of them; each would continue to receive the full 10 per cent commission on the gross rentals received from customers which each had theretofore contacted, solicited or procured for defendants.

Acting in pursuance of the above mentioned contracts plaintiff solicited and procured for defendants various customers to whom they supplied trucks and automotive equipment for use on sundry jobs, most or all of which were government defense projects. In some instances the orders were taken by plaintiff personally and in others they were transmitted directly by the customers to defendants. In either event if plaintiff obtained the account he was credited with the commissions.

In February, 1942, plaintiff was confined in the county jail for reasons which were unrelated to his employment. While he was so confined he wrote defendant L. M. Duntley inquiring as to how much he had coming to him in his final account. In April, 1942, plaintiff wrote Duntley that he had been sentenced to three months and that he would be in the Army before the sentence was terminated; that he was surprised to learn his final accounting amounted to only $400. About a

week before the 25th of August, 1942, plaintiff went to Dunt-
ley's office and made a request for moneys due him on account
of commissions, at which time Duntley told him to come back
in a week or so and he would "have something figured out."
On August 25, 1942, plaintiff called again at Duntley's office
and received two checks payable to his order, one drawn by
Leased Transportation Service in the amount of $192.12 and
the other drawn by General Truck Rentals in the sum of $29.40.
Each of these checks bore on the back thereof the notation:
"When endorsed this check will constitute a receipt for all
commissions due and payable." At the same time plaintiff
signed two releases one of which read as follows: "Received
of Leased Transportation Service $196.04 for all commissions
due and payable to the account of the undersigned: When
signed this receipt will constitute a release with Wendell
Weesner and Leased Transportation Service, for any and all
monies due Wendell Weesner." The other release was iden-
tical except it acknowledged receipt of $30 and released Gen-
eral Truck Rentals.

Plaintiff entered the United States Army on September 9,
1942, and remained in the service until February 28, 1946.
Upon his return to Los Angeles he received information which
was the basis for the present action.

The court found that plaintiff in pursuance of his employ-
ment solicited business for defendants and as a result of his
efforts defendants supplied trucks and automotive equipment
to certain specified customers on various jobs and projects;
that plaintiff was entitled to commissions on the gross rentals
received from such customers for which defendants had failed
to account. The court further found that defendants with
the intent to deceive and defraud plaintiff and as a means
by which to induce him to endorse the checks and sign the
releases, concealed from him the fact that from and including
January, 1942, the defendants had been leasing automotive
equipment to the McNeil Construction Company for use on
the Basic Metals and Magnesium Plant project at Las Vegas,
Nevada; that defendant General Truck Rentals had billed
and was entitled to receive as gross rentals for the use of the
equipment a sum in excess of $7,000; that defendant Leased
Transportation Service had billed and was entitled to receive
as gross rentals and compensation for the use of their equip-
ment a sum in excess of $100,000; that defendants had re-
ceived payments on account, on which commissions were pay-

able to plaintiff; that plaintiff is entitled to commissions in the amount of 10 per cent of all gross rentals and receipts obtained by defendants from the leasing of trucks and automotive equipment to the McNeil Construction Company for use on the Basic Metals project; that defendants, also with the intent to deceive and defraud plaintiff and as a means by which to induce him to endorse the checks and sign the releases, represented to him that all commissions to which plaintiff was entitled by virtue of the services rendered by him to defendants were included in those checks; that these representations were false and known to defendants to be false and thereby plaintiff was misled and induced to endorse the checks and sign the releases.

The court further found that during the period from February, 1942, to the time when plaintiff signed the releases and checks he had been for the most part without funds and hard pressed for a means of livelihood; that his indigent and necessitous condition and the state of his business, personal and domestic affairs were fully known to defendants; that they also knew that his departure for service in the United States Army was imminent; that knowing of the conditions and that plaintiff was without the means, resources, time or opportunity to investigate or protect and safeguard his interests and rights, defendants submitted the checks and releases and as a condition prerequisite to the payment thereof required his endorsement; that defendants obtained plaintiff's endorsement by taking a grossly oppressive and unfair advantage of his necessities and distress.

In accordance with these findings the court rendered an interlocutory judgment for an accounting and appointed a referee. The report of the referee was approved and adopted by the court and judgment was entered against defendants for the sums ascertained by the referee to be due plaintiff in accordance with the interlocutory judgment.

Defendants contend the evidence is insufficient to support the findings since (1) plaintiff did not perform all his obligations under the terms of the agreement of employment; (2) plaintiff could not possibly have been the procuring cause or effective cause of the leasing of equipment to Defense Plant Corporation (the Basic Metals job); (3) there was an accord and satisfaction between the parties and the evidence was insufficient to establish undue influence or fraud.

Defendants concede the rule to be that the finding of the trial court on conflicting evidence will not be disturbed on

appeal. However, they maintain there is no real or substantial conflict in the evidence upon the material issues and the evidence taken as a whole is legally insufficient to sustain the findings or support the judgment for plaintiff.

Both parties are in agreement that plaintiff was employed by defendant L. M. Duntley, the president of General Truck Rentals, as a broker to contact prospective customers for the leasing of their equipment; that it was originally agreed plaintiff was to receive a commission of 10 per cent on the gross rentals for any equipment leased to customers contacted by him and that the commission arrangement was later modified. It is defendants' contention, however, that in order for plaintiff to be entitled to the commissions it was necessary for him to service the account by inspecting the equipment while it was on the job and making periodic reports; that since the servicing of the account was a vital term of the employment contract, his employment terminated in February, 1942, inasmuch as after that date he could no longer check equipment and make reports while equipment was on a job.

Plaintiff testified that although once in a while he did check the equipment, there was no agreement that he should do so; Brooks testified that once he had established contacts on the jobs he received commissions until the end of the job; that if additional equipment was ordered after the initial order he received his commissions on the additional equipment placed on the job; that he checked the equipment "off and on" but stated he did not do any actual work himself. There is nothing in his testimony which would indicate that checking the equipment was a prerequisite to his right to the commissions. L. M. Duntley testified that it made no difference whether plaintiff brought in the order or whether it was mailed in, if they could "tie him into the account" he would be credited with the commissions; that plaintiff's business was making contacts with potential users of equipment; if plaintiff made the original contact, the user was considered his customer; at the time he and plaintiff entered into the employment agreement he told plaintiff that if he brought in an order for trucks which was acceptable to them they would pay him a commission on it; that he told him he would have to service the account.

From the foregoing it is clear that there is substantial evidence to support the finding that defendants agreed to pay plaintiff a commission on all rentals and receipts for the use

of automotive equipment received by defendants from any and all users thereof contacted, solicited or procured by plaintiff for defendants. Insofar as the requirement that the account be serviced is concerned, there is a conflict in the evidence which conflict the trial court resolved in favor of plaintiff.

Defendants maintain that plaintiff could not possibly have been instrumental in the leasing of equipment to the Defense Plant Corporation or McNeil Construction Company for the Basic Metals job; that plaintiff's claim for commissions on equipment placed on that project is based upon a conversation alleged to have taken place with one John Tremaine when the latter was working for McNeil-Zoss Construction Company on the Linda Vista Housing Project in San Diego, California, in May, 1941; that the conversation could not have taken place as alleged for the reason that no one knew of the Basic Metals job until September, 1941.

Plaintiff testified that he called upon Tremaine sometime in April, 1941, at the Linda Vista Housing Project; that his purpose in calling upon him was to try to place equipment on that project and he was successful in placing three trucks; that he called upon Tremaine again about a month later in May or June, 1941, in connection with a special order for two small dump trucks; that about a week later he delivered a truck to Tremaine; that he returned to Los Angeles and advised Duntley he had had a long conversation with Tremaine who was "interested in finding out whether or not we could furnish a tremendous amount of equipment to go on a job that he was going on and that the job wouldn't break for quite a little time, meaning a couple of months;" he told Duntley he had informed Tremaine he was quite sure they would be interested but he would rather discuss the matter with Mr. Duntley because the job was of such magnitude that it should be handled through principals and not through some broker; that if it was agreeable to Tremaine he would arrange to bring Duntley to San Diego; Duntley told him he handled it just right and that he would speak to his father about it; the following day Duntley told him to call Tremaine and make arrangements for him to see the latter on Saturday; Duntley accompanied him to San Diego on Saturday and he introduced Duntley to Tremaine; he excused himself and left the room when they started talking; he did not discuss the matter with Duntley immediately afterwards because there were other people around; he discussed it with Duntley later after he

returned from Camp Cook; Duntley told him he had been in touch with Tremaine and was going to meet him again; that it looked like the deal was going through. On cross-examination plaintiff testified that Tremaine had told him the deal would probably run into a half million or three quarters of a million dollars, or more; that McNeil Construction Company by whom Tremaine was employed was figuring on a big job in Las Vegas and was interested in getting the equipment lined up; that he thought his conversation with Tremaine and Duntley was in May or June but he was not sure since "there were so many jobs going at once he couldn't place the start of one and the start of another;" it was not until just before plaintiff went into the Army in September, 1942, that he learned the name of the Las Vegas project was "Basic Magnesium."

L. M. Duntley testified that he made a trip to San Diego where he met plaintiff at the Linda Vista project; his purpose in going there was to meet Tremaine; Weesner had intimated that Tremaine was going to be through with the Linda Vista job and was going to another one; that Weesner "wanted me to go down there and meet Tremaine;" Weesner introduced him to Tremaine; he tried to find out where Tremaine was going from Linda Vista when he was through with the job and "Tremaine said what his next connection was going to be;" they discussed the particular job the trucks were on; he had four trucks on the job and it was a comparatively small operation; Tremaine told him that he wanted to see him in Los Angeles sometime; that his job with McNeil-Zoss Construction Company would soon terminate. Duntley testified he did not remember exactly what the conversation was other than they were delivering the trucks and the job was coming to a close; that Tremaine told him at the time that he would probably be going on to another job from there very shortly; he believed he made the trip to San Diego in July or August; the meeting could not have been in April, May or June because the first trucks were not placed on the Linda Vista job until June and it was sometime after that; the meeting could have been in September.

Tremaine testified he did not remember meeting plaintiff but that if he was the man who brought the truck down, then he met him; he did not remember when he first met Duntley; it was sometime toward the end of the job, shortly before he left there; he could not remember whether or not he met him at Linda Vista; he may have seen him there; he saw too many

men to remember one person; he was so busy at Linda Vista that no one man impressed him at all, not even Mr. Duntley; he obtained equipment from Duntley for the Linda Vista project at the very tail end of the job; he first learned of the Las Vegas project from Howard Mann, the general manager of the Linda Vista project; Mann called him into his office and asked him if he would be interested in going to Las Vegas; that it was the very latter part of the job; that he thought it was in September, 1941; that he remained on the job until November 11, 1941; that it was about the same period of time that he had the trouble with one of the trucks supplied by Duntley; it was very possible the trouble with the truck might have occurred after the time he talked with Mann; it would have been impossible for him to have any conversation about the Las Vegas project in April, May or June because "nobody ever heard about the job until September, 1941, and it was a very secret thing;" that he called on Duntley in Los Angeles early in the spring of 1942 to see if he had available equipment; that he was "scouting equipment" and contacted suppliers of the San Diego project and all other suppliers of automotive equipment whose names he obtained from lists furnished by the Chamber of Commerce and other lists.

Defendants argue that plaintiff's testimony is not to be believed since he had been convicted of a felony and that the veracity and credibility of the defendants was unimpeached. Furthermore, they assert, plaintiff's only possible link to the Basic Metals project was through Tremaine; that Tremaine had testified he could not have had any conversation regarding that project with plaintiff in May or June because it was unknown before September; that this testimony was uncontroverted and therefore plaintiff could not possibly have been the procuring or effective cause of the leasing of equipment by defendants to the Defense Plant Corporation for use on the Basic Metals job; furthermore that there is no evidence he had secured a binding contract for defendants or brought the lessee and defendants together so that defendants could secure a binding contract.

Plaintiff testified he believed Tremaine spoke to him about the Las Vegas project "along in May;" he was not certain about the date. This was some time after defendants had supplied trucks for the Linda Vista job. Duntley testified the trucks were placed on that job in June; he discussed the trucks with Tremaine and at that time Tremaine told him the job at Linda Vista was coming to a close. Tremaine testi-

fied that he obtained equipment from Duntley toward the end of the Linda Vista job; that the trouble he encountered with Duntley's truck could have occurred after his conversation with Mann in which he learned of the Las Vegas project. Taking the testimony of the three parties as a whole, the discrepancy in the date does not appear to be material. The testimony of plaintiff, much of which is corroborated by Duntley and Tremaine, is sufficient to sustain the finding that plaintiff was the procuring cause or effective cause of the leasing of equipment for the Basic Metals (Magnesium Plant) at Las Vegas, Nevada, and that he was entitled to commissions on the gross rentals received by defendants for the equipment. Evidence of plaintiff's conviction of a felony was introduced for the purpose of impeachment. ■ The weight of testimony and the credibility of witnesses are matters for the trial court. (*Rothschild* v. *Davis,* 217 Cal. 660, 661 [20 P.2d 329]; *Estate of LeSure,* 21 Cal.App.2d 73, 81 [68 P.2d 313]; Code Civ. Proc., § 1847.)

■ Defendants' contention that plaintiff is not entitled to the commissions because he did not obtain a binding contract is untenable. There was no requirement in the agreement between plaintiff and defendants that plaintiff obtain a binding contract. Duntley testified that it made no difference whether plaintiff brought the order in or it was mailed in since he would be credited with commissions if they could "tie him into the account." The court having found that plaintiff was the procuring cause, and the evidence being uncontradicted that defendants supplied automotive equipment to the Basic Metals project, plaintiff is entitled to his commissions. ■ Where the evidence is conflicting, the conclusion as to the procuring cause is one for the trial court and will not be disturbed on appeal. (*Brea* v. *McGlashan,* 3 Cal.App.2d 454. 465 [39 P.2d 877].)

■ Defendants contend that the releases and checks constituted an accord and satisfaction between the parties and that the evidence is insufficient to sustain the findings that plaintiff was induced to sign the releases and endorse the checks by the fraud and deceit of the defendants. They maintain that there was a bona fide dispute between the parties as to the amount of commissions owing to plaintiff, as evidenced by the exchange of correspondence between the parties while plaintiff was in the county jail; that notwithstanding this dispute plaintiff executed the releases, accepted the checks and cashed them.

Obviously there was no dispute at that time between the parties as to commissions due plaintiff on equipment placed on the Basic Metals project since plaintiff had no knowledge at the time he executed the releases that defendants had been leasing equipment to McNeil Construction Company for use on the Basic Metals job since January, 1942, and that they had billed and were entitled to receive rentals and compensation for that equipment. ■ A review of the entire record discloses ample and substantial evidence with respect to defendants' methods of bookkeeping, their dealings with defendant Gardner and their deceit and undue influence to support the findings of the trial court.

■ Contrary to defendants' contention, the court did not err in admitting evidence as to plaintiff's financial condition at the time he executed the releases. That evidence was properly before the court for consideration in determining the question of fraud and undue influence. (Civ. Code, § 1575; *Carr* v. *Sacramento Clay Prod. Co.*, 35 Cal.App. 439, 447 [170 P. 446].)

■ Defendants' assertion that plaintiff is not entitled to commissions on the gross rentals received by them on the equipment which was "reclaimed" or "recaptured" is likewise without merit. It is their contention that in those instances where Defense Plant Corporation exercised the option to acquire title to the equipment defendants were in reality selling automotive equipment; that since respondent was not engaged to sell equipment he was not entitled to any commissions on the revenue and receipts derived from reclaimed equipment. The contracts when originally entered into were leases with an option to purchase. The income for the use of the equipment was carried on the books of defendants as rentals. The fact that the government later exercised its option to purchase the equipment and acquire title by paying the difference between the rental paid and the total reclaiming price could not deprive plaintiff of his commission on rentals which had been theretofore received by defendants for the use of the equipment.

Judgment affirmed. The purported appeals from the interlocutory judgment and from the report of referee on accounting which are nonappealable, are dismissed.

Moore, P. J., and McComb, J., concurred.